Reynolds *v.* Kenyon.

[ONONDAGA GENERAL TERM, April 4, 1865. *Mullin, Morgan, Bacon* and *Foster,* Justices.]

---

REYNOLDS, *vs.* KENYON, President of the Citizens' Bank.

On the 1st of June, 1857, the plaintiff had in deposit in the bank of which the defendant was the president, the sum of $8000 in cash. The bank also, at the same time, had in deposit and for collection, in behalf of the plaintiff, a note for $2000, made by G., the cashier. On that day the plaintiff, being then at the west, wrote to G. enclosing his check on the bank for $2000, for which he desired G. to remit to him two drafts on New York, for $1000 each. He also requested G. to forward to B. at La Crosse, three drafts, in all amounting to $2000 and apply the same on his (G.'s)

note then held by the bank and past due. The two $1000 drafts were sent to the plaintiff, accordingly, and on the 23d of June G. transmitted, by mail, to B. the three drafts, amounting to $2000. G., however, instead of applying the $2000 upon the note made by him, charged that sum to the account of the plaintiff, on the books of the bank, notwithstanding he (G.) had to his credit, in the bank, a sum sufficient to make good the amount of the drafts. And he did this with the knowledge of the president, who was aware of the plaintiff's instructions, and cognizant of all the facts. The plaintiff was not informed by G. that the amount of the drafts sent to B. had been charged to the plaintiff's account, but received and parted with the drafts as so much money paid upon G.'s note; and when he learned that his instructions had been violated, he repudiated the transaction, and demanded the $2000 from the bank.

*Held* that an action would lie, by the plaintiff, to recover from the bank the $2000 so charged to his account by G.

*Held, also,* that the plaintiff having received the money, or its equivalent, without any suspicion that it was not a lawful appropriation of funds belonging to G., or which he had applied with the full knowledge and approbation of the bank, if G. obtained such funds improperly and by an act which, as between him and the bank, could be esteemed and treated as fraudulent, the loss should fall upon the party who had put G. in a position to perpetrate a fraud, and constituted him the apparent owner of the money.

*Held, further,* that G. being the financial officer of the bank, clothed with power, as to outside parties, to draw drafts and to appropriate its funds, in all matters falling within the apparent scope of his authority, his principal was bound by his acts within that limit, as to all persons dealing with him in good faith.

Such persons are not bound to inquire into facts *aliunde;* the apparent authority is the real authority.

APPEAL from a judgment entered upon the report of a referee. The action was brought to recover the sum of $2000, for money had and received by the defendant for the plaintiff's use. The facts are briefly these: Sometime prior to June, 1857, the plaintiff delivered to the bank for collection a note for $2000, owned by him and made by Grosvenor, the cashier of the bank. During the whole month of June, he had a large amount of money, amounting to several thousand dollars, on deposit in the bank, upon which the bank had agreed to pay him interest. On the first day of June he wrote to Grosvenor, as cashier, from La Crosse, enclos-

ing a check for $2000 on the bank, requesting G. to send him two drafts on New York of $1000 each; and in the same letter he also requested him to send him three drafts, amounting to $2000, and indorse the amount on the said note made by him, the cashier, and then in the bank. On the 9th day of June, Grosvenor, as cashier, enclosed in a letter to the plaintiff the two drafts on New York, of $1000 each, and in the same letter said he would endeavor to comply with the plaintiff's wish in regard to the note. On the 23d of June, without having had any further communications with, or directions from the plaintiff, he wrote a letter as cashier, enclosing the three drafts which were asked for in the plaintiff's letter of June 1st, and said that he sent them at the request and by the direction of the plaintiff. The plaintiff negotiated the draft, and obtained the money upon them, and immediately invested the money in land, and gave the land to his daughter. The plaintiff supposed that the $2000 sent in the three drafts had actually been applied upon his note, until on the 12th of August, when he met Grosvenor at Utica. He then learned from him that instead of doing as he had requested, G. had drawn the drafts as cashier, and charged the amount to him, Reynolds, upon the books of the bank and had not applied the amount upon the note. The plaintiff then repudiated the transaction and Grosvenor agreed to rectify the charge on the books of the bank; and the plaintiff has ever since claimed that the $2000 should apply upon the note and not be charged to him in account. On the 23d of June, Grosvenor had more than $2000 to his credit in the bank, and could have paid this $2000 from his own money on that day, but with the knowledge of the president of the bank, pretending to comply with the request contained in the letter of June 1st, he drew the three drafts as cashier and charged the amount, without any authority, or voucher, to the account of the plaintiff. The bank never demanded the $2000 back from the plaintiff, but refused to pay him $2000 of his deposit, for which this action was brought.

The referee reported in favor of the plaintiff, for the amount claimed.

*J. H. Townsend,* for the appellant. I. The defendant's exception is well taken to the referee's ninth finding of fact. The finding is not supported by any evidence in the case. The referee finds that the president of the bank assented to the sending of the drafts. The only evidence upon this subject is that of Mr. Kenyon himself, where he says that he "did not consent to his sending the drafts."

II. The defendant's exception is well taken to the referee's finding of fact that the president "was then financial officer of said bank." There was no evidence whatever on this subject, and the fact was quite otherwise, as the office of president was but a nominal non-salaried office. It is sufficient however for the purpose of the exception that there is no evidence whatsoever in support of this finding of fact.

III. It will not be contended that Grosvenor had any right to take the funds of the bank, and with them pay his own debt, and it is equally clear that Grosvenor neither asked for, nor was any credit extended to him at the bank. He either took the *plaintiff's* funds, which the plaintiff insists he did not do, or he wrongfully took the funds of the bank. If Grosvenor without authority took the funds of the bank, the bank can follow and recover the funds, until such time as they shall have come to the hands of a bona fide holder, who has parted with value, and the plaintiff having received and had the benefit of the funds, is liable to account to the defendant therefor. The case of *The Mechanics' Bank* v. *The New York and New Haven R. R. Co.,* (3 *Kern.* 599,) perhaps affords some little light to guide us in this case, as Schuyler in that case "had no power to issue a certificate for shares of stock except upon the condition precedent of a transfer on the books by some previous owner, and the surrender of that owner's certificate." So in this case, Grosvenor had no right to issue the defendant's drafts except upon

the condition precedent of selling the same in the ordinary course of banking business. He certainly might not issue them in payment of his own debt, and if the certificates of stock so issued by Schuyler were void even in the hands of a purchaser in good faith for value, much more is the defendant in this case entitled to follow the drafts to the hands of a party who had obtained them without parting with any value. We think also that we recognize the principle of our proposition laid down quite as strongly as it is necessary for us to claim in this case, in *Comyn on Cont.* 760, (*4th Am. ed.*) as follows : "A factor or agent who has power to sell, can not bind or affect the property of them by tortiously pledging or otherwise disposing of them, either by way of security for, or in satisfaction of his own debt; and where goods are thus pledged or disposed of, the principal may recover them back by action of trover against the pawnee, without tendering to the factor or agent what may be due to him, or without any tender to the pawnee of the sum for which the goods are pledged, although the latter was wholly ignorant that the former held the goods as mere factor or agent." See also *McCaudin* v. *Davis*, (7 *East*, 5 ;) *Dawbigany* v. *Duval*, (5 *T. R.* 604;) see also 1 *Cowen's Tr.* 94, (3*d ed.*) where we find the same principle recognized in this language : "If my son have a general authority to receive money, he may bind me by a receipt for it, *and if he give it away I can only recover it of the donee.*" *Amidon* v. *Wheeler*, (3 *Hill*, 137,) recognizes the same principle. Where a servant had, with his principal's money, paid to the clerk of the court the amount of a fine against one McCoy, Nelson, Ch. J. used this language : "The money received by him, therefore, was the plaintiff's money, and must be regarded as having been received and as still held for the plaintiff's use." And again, on page 139, "had the defendant received the money, under the circumstances of the case, upon a demand of his own against McCoy, it can not be doubted for a moment that the payment would have been void, and he liable to refund the

amount to the plaintiff." In *Hill* v. *The Supervisors of Livingston Co.*, (2 *Kern.* 52,) the action was to recover the amount of a tax alleged to have been illegally collected, and on page 62 we find this language : "Money realized from taxes levied and assessed by the board of supervisors without authority of law, and paid into the county treasury to the use of the county, and as a part of the county funds, to be employed for county purposes, is money had and received by the county to and for the use of the person whose money has been thus illegally taken from him. It equitably and honestly belongs to him, and unless a county is by some law exempt from the ordinary principles by which the liabilities of natural persons and other corporations are determined, an action will lie against it as a corporation, for the recovery of such money. On something the same principle the Bank of Commerce was allowed to recover of The Marine Bank, (3 *Comst.* 230,) the amount paid upon an altered bill of exchange. (*See also Bank of Orleans* v. *Smith,* 3 *Hill,* 560 ; *Stalker* v. *McDonald,* 6 *id.* 93 ; *Henry* v. *Marvin,* 3 *E. D. Smith,* 71 ; *Merrill* v. *The Bank of Norfolk,* 19 *Pick.* 32.)

IV. The plaintiff, by his letter of June 1, made Grosvenor his agent to purchase the drafts, and in that part of the transaction *Grosvenor acted,* as well as assumed to act as the plaintiff's agent, and although while so doing Grosvenor disregarded his instructions as to the paying for the drafts, still the money coming to the hands of the plaintiff, and he deriving benefit from the transaction, is bound to make good to the bank the purchase price of the drafts. The plaintiff knew that Grosvenor had no funds of his own to draw upon in New York, and when he directs Grosvenor to send him $2000, in three drafts, he intends either that Grosvenor shall purchase the drafts somewhere, or else (which the plaintiff will hardly admit, as in such case his liability would be certain beyond question,) intended that Grosvenor should use the bank's drafts in payment of his individual debt. If the plaintiff intended that Grosvenor should purchase the drafts

Reynolds *v.* Kenyon.

of the defendants and pay for them with the avails of the note then in the bank for safe keeping, the case is not unlike to that where a principal furnished his agent with money to make a purchase or (exactly this case,) directed the agent to make the purchase and for the purchase price, pay funds of his own and charge in account to the principal, and the agent makes the purchase, but has the purchase paid charged by the seller to his principal, and the principal receives the goods and applies them to his own use. (1 · *Cow. Tr.* 90.) "My servant borrows fifty dollars, which comes to my use, and gives a note in my name for it, I am bound although I had not instructed him to do such acts." "When the master *delivers money to his servant* to procure victuals and the servant buys them in his master's name, but does not pay for them, still the master is liable if the victuals come to his use. (15 *Viner's Abridg.* 309. 1 *Camp.* 85, 109.)

V. Although we do not conceive that the question of notice is involved in this case, for the reason that the plaintiff is in no wise a bona fide holder for value, still it may be remarked that when the plaintiff asks for and receives the drafts of *Geo. Grosvenor, cashier* of The Citizens' Bank, upon the corresponding bank in New York, in payment of *Geo. Grosvenor's individual debt,* he should at least be subjected to inquiry as to how Grosvenor came by authority to pay his individual debt with his official draft. The referee, as appears from his opinion, *overlooks the fact that the drafts were drawn by Grosvenor himself,* and of course bore upon their face notice that Grosvenor was drawing upon the funds of the bank in paying his individual debt. The plaintiff in such case is chargeable with notice. (*Claflin* v. *Farmers and Citizens' Bank,* 25 *N. Y. Rep.* 293.) And we have here just the distinction which the referee seems to have overlooked when he refers to a bank being bound by the teller's certificate of a check which is not the fact, when, as in this case, the teller certifies to the goodness of his own check.

Reynolds *v*. Kenyon.

In such case the bank is not liable.    (*See the case last above cited.*)

VI.  The referee in his opinion seems to concede that if the amount received by the plaintiff from Mr. Grosvenor, had been in property, as in the case of *Henry* v. *Marvin*, (3 *E. D. Smith's Rep.* 71,) above cited, or even in negotiable paper, under our laws protecting only the holder in good faith for *value*, it could have been followed and recovered by the bank.   The referee, however, based his decision upon the finding that the three drafts were neither property nor negotiable paper, but money, without ear marks, and for that reason the defendant is left without remedy.   We submit that in this particular the referee erred.   (*a.*) There is no evidence in the case to support the finding of fact, " that the drafts were resorted to as a means for the remittance of money, &c."   There is no evidence whatever upon that point; on the other hand, the plaintiff in his letter of June 1st called for the identical property, i. e. *drafts* which were sent to him. They were not resorted to for the remittance of money, for the money which the referee finds was remitted in this way had not been paid.   (*b.*) These drafts were strictly bills of exchange, (3 *Kent's Com.* 86, 7th ed ; *Edwards on Bills and Notes*, 41 ; *Story on Bills*, §§ 2, 3,) and as we have shown, under our fifth point, could not have been collected by the plaintiff of the bank; the plaintiff not being a bona fide holder for value without notice ; and whatever may be the law governing them in other states or in the United States, as suggested by the referee, they are in this case to be governed by the established laws of this state.

*R. Earl*, for the respondent.    I.  The plaintiff was a general depositor, and by his deposit he became a creditor of the bank.   (*Angell & Ames on Corp.* 219.)

II.  The bank was bound by whatever Grosvenor did as cashier, and notice to him was notice to the bank.   (*Angell & Ames on Corp.* 295, 299, 302.   *Story's Agency*, §§ 114,

115. *Parsons on Mercantile Law,* 39, 40. *The Bridgeport Bank* v. *The New York and New Haven R. R. Co.,* 1 *Amer. Law Reg., N. S.* 210 ; *S. C.* 30 *Conn. R.* 231, 270, 271, 272. *The Union Bank* v. *Mott,* 17 *How. Pr. R.* 353.)

III. The first view we take is that this was a transaction between Reynolds and the bank. 1. The bank had received the note for collection, and held it for that purpose. 2. On the 1st of June, Reynolds, in legal effect, wrote to the bank to get the money of Grosvenor, and forward it to him in drafts on New York. 3. On the 9th of June the bank wrote to Reynolds, agreeing to do so. 4. On the 23d of June the bank sent the drafts, according to the previous request and agreement. 5. Reynolds is not affected by what took place in the bank, of which he had no notice, and the bank can not affect him by merely charging upon its own books. 6. It matters not that Reynolds was a depositor and creditor. Suppose he had not been a depositor, could the bank have sent the money to him, and have made him a debtor by charging it to him ? 7. Suppose Reynolds, not being a depositor or creditor of the bank, had left a note in the bank for collection against any outside party, and suppose he had requested the bank to collect the money and forward it to him, and it had agreed to do so ; and it afterwards sent him the money, giving him to understand that it did it in pursuance of his request and its agreement, could it reclaim· the money or make him debtor to the bank, because, instead·of collecting the money on the note, it sent its own money ?

IV. But if· this was not, in legal effect, a transaction between Reynolds and the bank, then it must be treated as a transaction between him and Grosvenor; that is, Grosvenor got the drafts from the bank and sent them to him to pay the note. Taking this view the result must still be the same, and the $2000 must apply upon the note as payment. 1. Grosvenor having been requested to pay the note, and having agreed to do so, can not bind Reynolds by getting the

money on drafts upon his credit without his knowledge, and sending it to him to apply upon the note. 2. Grosvenor's secret intentions at the time are of no account. The legal effect is what we must look at. 3. The bank had notice through Grosvenor and its president that there was. no authority to take the money or drafts upon the credit of Reynolds, or to charge them to him.

V. But it is claimed by the defendant that Grosvenor had no right to draw and send the drafts; that he got them of the bank fraudulently, and hence that the plaintiff got no title to them or the money represented by them. This view will not, however, help the defendant. 1. It is not, and can not be, claimed that Grosvenor took the drafts feloniously. (*Fassett* v. *Smith*, 23 *N. Y. Rep.* 252.) 2. The bank never, before the commencement of this suit, treated the drafts or money as having been taken fraudulently or tortiously. It knew just how they had been taken and sent, and yet did not attempt to reclaim them or the money, and did not repudiate the transaction or demand back the drafts or money. 3. In what sense were these drafts fraudulently taken? Suppose Grosvenor had overdrawn his own account on that day $2000, not with the intention of stealing or embezzling the money, but with the honest intention of making it good at some future time—a mere over-draft ; and suppose with these funds he had purchased the drafts, and the drafts had been sent to and received by Reynolds, to apply upon the note, could Reynolds, in such case, be made to account for the drafts to the bank? We say not. If, after taking the funds in such a case, he charged them to Reynolds, the wrong would consist in charging them to him, and not to himself. 4. But Grosvenor had more than $2000 to his credit in bank on that day. Hence he had the right to take $2000, and committed no wrong in so doing. He committed the wrong in charging the amount to Reynolds, and in treating his own account as still good, and subsequently drawing it down as if he had not had the $2000. 5. The referee

Reynolds *v.* Kenyon.

does not find that Grosvenor took the money or drafts from the bank fraudulently or tortiously. But he finds that he took them honestly, with the knowledge and assent of the president, who was the financial officer of the bank. Fols. 23, 24, 25. 6. It is, however, conceded on the part of the defendant, as we understand, that if Reynolds had become a bona fide holder of the drafts for value the bank could not have reclaimed them, and that Grosvenor so far had authority to issue the drafts that bona fide holders for value would be protected. Now, how does Reynolds stand? He received these drafts, as he supposed, upon his note. He negotiated the drafts for money; paid out the money for land, and gave it to his daughter—all the time acting in good faith, without any notice of any wrong on the part of Grosvenor. Therefore before he got any notice of what was done in the bank, or of any claim by the bank, he parted with the drafts, and the proceeds in no way formed any part of his estate, and had, without any benefit to him, passed out of his reach. Under such circumstances we claim the bank can not recover the value of the draft from him. But if it can recover from any one but Grosvenor, it must be from Reynolds' daughter, who received the proceeds of them, and now has them, without having parted with any value, as a gift. (1 *Amer. Law Reg. N. S.* 35, *and note.* 14 *N. Y. Rep.* 623. 16 *id.* 125. 26 *How. Pr. R.* 1.)

VI. The reasons given by the referee in his opinion are an abundant warrant for his decision.

It is, therefore, submitted that the judgment should be affirmed, with costs.

*By the Court,* BACON, J. The substantial facts of this case are not controverted, and admit of no complication whatever; and the principle of law adapted to them ought to be obvious, and of very easy application. On the 1st of June, 1857, the plaintiff had in deposit in the bank, of which the defendant was and is the president, the sum of $8000 in

cash. The bank also, at the same time, had in deposit, and for collection in behalf of the plaintiff, a note of $2000 made by Grosvenor, the cashier. On that day the plaintiff, being then at the west, wrote to Grosvenor, enclosing his check on the bank for $2000, for which he desired him to remit to him two drafts on New York for $1000 each. He also requested Grosvenor to forward to L. S. Benton, by the 23d of June, three drafts, in all amounting to $2000, and apply the same on his note then held by the bank, and past due. The two $1000 drafts were accordingly forthwith sent; and on the 23d of June, Grosvenor transmitted by mail to Benton the three drafts desired by the plaintiff. They were duly received, and the avails at once invested in real estate, which was bestowed as a gift upon his daughter. Instead, however, of applying the $2000 upon the note of Grosvenor, as instructed, and thus cancelling that indebtedness, Grosvenor, in direct violation of his instructions, charged the $2000 to the account of the plaintiff on the books of the bank. This he did, too, with the knowledge of the defendant, who was president of the bank, and who saw the letter of the plaintiff, which contained the only direction in respect to the $2000. He says, indeed, that he did not consent to Grosvenor's sending the drafts, but he was cognizant of all the facts and uttered no protest, and ventured on no remonstrance. If it were of any consequence, this conduct would be held to be a tacit consent to the transaction, binding upon him as an officer of the bank. In sending the money, Grosvenor gave no intimation of the manner in which he had disposed of, or attempted to dispose of, $2000 of the plaintiff's money ; but the latter received and parted with the drafts as so much paid upon the note of Grosvenor, leaving his account undiminished, except to the extent that he had directly drawn upon it. And it was not until the 12th of August, subsequently, that he learned of the transaction, when he at once repudiated it, and demanded the $2000

from the bank. Payment being refused, this suit is brought to recover the amount, with interest.

It results from this statement that the defendant's bank had on the 23d of June, 1857, $2000 of the plaintiff's money, which it was bound to pay at any time on demand. Has it paid that money? The defendant's counsel insists that it has ; or, to state the proposition in other words — because the cashier of the bank violated the instructions of the plaintiff, and took the plaintiff's money, with the knowledge of the president of the bank, to purchase the drafts remitted, instead of taking his own money in the vaults. of the bank and discharging his own debt, therefore the bank is to escape all liability, retain that $2000, and turn the plaintiff over to recover of an insolvent debtor a probably outlawed debt. The principle on which it is claimed that the bank has not only discharged its obligation, but can even follow and recover the funds it has parted with, is that (treating Grosvenor as the factor or agent of the bank, his principal) he could not bind or affect the property of the principal by tortiously pledging or otherwise disposing of it in satisfaction of his own debt ; and that property thus pledged or disposed of may be recovered back by action of trover against the pawnee, without any tender of the sum for which it is pledged, although the latter was ignorant of the fact that it was held in a fiduciary capacity.

It seems to me there are several satisfactory answers to this proposition, as attempted to be applied to this case. In the first place, it can not very well be claimed that Grosvenor took these drafts tortiously, and fraudulently converted them. The bank has never so treated the transaction, or, before this suit, attempted to reclaim them upon any such ground. It knew perfectly well how they had been procured, and how they were sent. It knew, or was bound to know, that Grosvenor had to his credit in the bank a sum sufficient to make good the amount of the drafts ; and if the bank desired to repudiate the use made of the drafts, it

should have been done promptly, and the plaintiff should have been advised that, unless he consented to such an appropriation of his funds, the amount should either be restored to his account, or the application made to the extinguishment of Grosvenor's debt.

In the second place, the principle may have its appropriate application to personal property capable of transfer by delivery and of identification, but can have no application to money, or that which represents money, which, "having no ear-marks, can not be identified, and which is used as money;" a bank draft, employed as a medium for the transmission of funds, is not personal property, as that term is used and understood. It is not even commercial paper, with the incidents and equities which the *Law Merchant*, as expounded in this state, applies to such paper. It may not be employed, in the strict and technical sense, as a circulating medium, but it passes freely from hand to hand, and, for most commercial purposes, is used as money. I can not perceive any difference in principle between the case as it stands, and that which might have existed if the plaintiff had presented himself at the bank and demanded payment on his note, and Grosvenor, instead of drawing upon New York in the name of the bank for the funds, had taken the circulating notes of the bank, of which he was the custodian, and paid them to the plaintiff, professedly in compliance with the demand of the plaintiff and in discharge of his note. Could the defendant, in such a case, have reclaimed the bills? Above all, could it have done so when the plaintiff received them in good faith as a payment upon his debt, and had already parted with them for property, of which, by a lawful and voluntary gift, he had dispossessed himself? To ask these questions is, it seems to me, to answer them, and the answer effectually disposes of the assumption upon which the claim of the plaintiff in this case is resisted.

Reynolds *v.* Kenyon.

There is another principle still, alluded to by the referee in the opinion accompanying his report,(*a*) which demonstrates that the loss in this case, if one or the other party is to suffer, should fall upon the defendant, and not upon the plaintiff. The latter received the money, or that which was its equivalent, without any suspicion that it was not a lawful appropriation of funds belonging to Grosvenor, or which he had applied with the full knowledge and approbation of the bank. If Grosvenor obtained them improperly, and by an act which, as between him and the bank, could be esteemed and treated as fraudulent, still the loss should fall upon the party who has put the person in a position to per-

(*a*) The following is the opinion of the referee, (Hon. William F. Allen:) " The claim of the defendant in substance is, that a creditor receiving money from his debtor is bound to know the claim or title of the payer to the money, and if it in truth is the money of a third person which is held as trustee or which in any manner has come to the possession of the payer, but which he has no authority to use for his own purposes, the receiver can be made to answer for it in an action for money had and received to and for the use of the rightful owner at any time before the statute of limitations runs against the demands. If a cause of action exists at all, it springs from the receipt of the money which it is said *ex æquo et bono* belongs to the claimant, and exists from the time of the receipt, and of course can only be barred as other actions are barred. This is a startling proposition, and if true places the creditors in an awkward and critical position in receiving moneys from their debtors when such debtors may occupy a fiduciary relation to others in which they may have the control of the funds of their principals or wards as *cestuis que trust*. It would put them to an inquiry as to the source of title to the money offered in payment, and to learn the truth upon peril of being compelled to account to some third person for money received as their own, long after the debtor may have become solvent, or perhaps died. If the true owner of money thus appropriated chances to be a *feme covert* or an infant, it may be that very many years will elapse before the least intimation will be given to the party receiving the money that he has involuntarily become a debtor to a stranger. For the claim is that *scienter*, knowledge by the creditor of the source of the title to the money at the time of the receipt, is not essential to his liability to account. In the transfer of commercial paper the rule in this state is that the taker, unless he parts with value at the time, receives and holds it subject to any equities existing against it in the hands of the transferer in favor of any party to it or any third persons claiming title to it. In others states and in the United States the rule is

petrate a fraud, and constituted him the apparent owner of the money. The teller of a bank has no authority to certify that a party has funds in the bank, except the fact is as the paper represents ; and yet if he does thus certify in violation of his duty, for the mere accommodation of a party, and the certified check falls into the hands of a *bona fide* holder, the latter can enforce it against the bank. This precise proposition is decided in the *Farmers' and Mechanics' Bank of Kent County* v. *Butchers' and Drovers' Bank*, (16 *N. Y. Rep.* 125.) That principle is applicable to this case. Grosvenor was the financial officer of the bank, with power to draw drafts and appropriate its funds in all matters fall-

different, and gives a good title to commercial paper to any one taking it upon a good consideration in good faith in the usual course of business. It is not material to inquire which is the best rule. It is enough that even in this state the rule has not been applied to money, that which having no earmark can not be identified or that which is used as money. Now a bank draft is not in any sense commercial paper. It is the means of remitting money from one place to another. It may not be used technically as a circulating medium, and yet passes from hand to hand and is used as money for commercial purposes. It represents so much money paid by the payer to the drawing bank, and is a direction to the drawee to repay that amount to the holder of the draft. It matters not whether coin or bank notes are transmitted directly to the plaintiff, or the coin or bank notes paid to the defendant in exchange for their request to their correspondent in New York to pay the like amount there. In neither case could the plaintiff trace the title of Grosvenor to the money, and in both cases it is a payment of money by Grosvenor to the plaintiff. The case is not at all different from what it would have been if the plaintiff had personally applied to Grosvenor at the bank for the payment of his debt and the debtor had paid him in the circulating notes of the bank or any other current money. The plaintiff could not have known whether he was taking money which was rightfully his, or whether he was abstracting it from the bank. If the plaintiff had then used the same money for the purchase of a bill on New York it would have been on all fours with the case in hand. But it would hardly be claimed I think that the bank could, under these circumstances, recover the money thus paid, of the plaintiff. The fact that Grosvenor claimed to be cashier of the defendants does not affect the plaintiff or touch the question of his liability. Suppose that he had not been such cashier, but had been an executor or trustee having trust money in his hands, and upon being applied to, as in this case, had with those funds purchased the drafts, could the parties whose

Reynolds *v.* Kenyon.

ing within the apparent scope of his authority. Such, at any rate, was the power with which, as to outside parties, he was clothed by the bank ; and whenever, by comparing the act done with the power, the act is warranted by the terms of the power, the principal is bound as to all persons dealing in good faith with the agent. Such persons are not bound to inquire into facts *aliunde:* the apparent authority is the real authority ; *North River Bank* v. *Aymar*, (3 *Hill*, 262 ;) a case which, from its alleged reversal in the court of errors, may have seemed heretofore to be somewhat shaken, but the principle of which has been often since reaffirmed, and is now firmly established by

money was used in the purchase of the drafts reclaim them? I think not. A party receiving not negotiable paper but money or that which is used for and passes as money, in good faith, is without notice of any defect in the title of the payer, or any thing to cause a suspicion of such title, and in the usual course of business, is entitled to protection, and the loss, if any, must fall upon him who with or without fault has put the person in a position to perpetrate a fraud, if he has not the right to use the money as his own, who has put him in position of apparent owner of the money. A teller of a bank has no authority to certify checks or give certificates of deposit, except when funds are actually on deposit. Nevertheless his certificates are good against the bank as to every bona fide holder, and this is the result of commercial necessity as well as of the rule which holds the principal liable to the extent of the apparent authority of the agent, and for the fraud of the agent in the business of the agency. By whom the drafts were drawn in behalf of the bank does not appear. It may be assumed that they were drawn in the usual way and by the authorized agent of the bank. The bank, therefore, by its authorized agents certified to the plaintiff that it had been paid $2000, and directed that amount to be paid to him, and gave that certificate to his debtor to be used by him in the payment of his debt to the plaintiff, and it was so paid. Who shall suffer? Certainly not the plaintiff, but the defendant if any one, whose president and cashier thus placed in the hands of the debtor this money or the usual representatives of and substitutes for money, to be appropriated to the payment of his debt. In another class of actions stress is laid upon the fact that the party receiving property from his debtor in payment of his debt knows at the time that it is partnership property which the debtor can not lawfully use for his individual purposes. (*Dob* v. *Halsey*, 16 *John*. 34.) Without examining cases in detail, I will only say that I know of no case charging the plaintiff with this money, and that I can not reconcile it with equity or justice, or any principle of law to hold him liable."

the judgment of the court of appeals in *Exchange Bank* v. *Monteath*, (26 *N. Y. Rep.* 505.) In the words of Lord Holt in *Ham* v. *Nichols*, (1 *Salk.* 269,) " Seeing somebody must be a loser by the deceit, it is more reasonable that he that employs and puts confidence in the deceiver should be the loser, than a stranger." It is not necessary, for the protection of the plaintiff, that he occupy in all respects the position of a *bona fide* holder of commercial paper without notice of any defect in his title, although it is true that, before he had any knowledge of the real transaction and of the claim set up by the bank, he had parted with the drafts and disposed of the money, which, without any benefit to him, had passed out of his reach, and formed no part of his estate. He acted in perfect good faith, and on the presumption that Grosvenor and the bank had fulfilled his commission and not misappropriated his funds. I think, upon well-settled principles and the strongest equity, he is entitled to recover, and that the judgment should be affirmed.

